UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| JEFFREY J. ZANDER, individually and as Trustee of the CARDINAL TRUST under Agreement dated February 11, 2009, and JJZ INSURANCE AGENCY, a Tennessee general partnership d/b/a ZANDER INSURANCE GROUP, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | No. 3:12-cv-967 |
| v. | ) ) ) | Judge Sharp |
| KATZ, SAPPER & MILLER, LLP; KSM BUSINESS SERVICES, INC., and ANDREW J. MANCHIR. | ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM**

Pending before the Court are four motions: Defendant Katz, Sapper & Miller, LLP's motion for summary judgment (Docket No. 69); Defendants' motion for partial summary judgment (Docket No. 97); Plaintiffs' motion for summary judgment (Docket No. 71); and Plaintiffs' motion to strike (Docket No. 88). For the reasons that follow, the Court will DENY each motion.

**BACKGROUND**

This matter concerns a simple dispute that arises from a complicated transaction. The intricacies begin with the names and relationships between the parties. The Plaintiffs in this case are Jeffrey J. Zander, individually and in his capacity as Trustee of the Cardinal Trust, and JJZ Insurance Agency ("JJZIA"). The Defendants are Katz, Sapper & Miller, LLP ("the LLP"), an

1

Indiana certified public accounting firm, KSM Business Services, Inc. ("KSMBS"), an Indiana business-consulting affiliate of the LLP, and Andrew J. Manchir, an Indiana-based Certified Management Accountant who, Plaintiffs allege, is an employee of both the LLP and KSMBS.

Prior to the September 2011 transaction at the heart of this case, Jeffrey Zander owned 100% of JJZIA, a Tennessee general partnership that sells insurance products under the name Zander Insurance Group. In 2010, Zander sought to recapitalize his interest in JJZIA by transferring a minority of his interest in the company to a newly created employee stock ownership plan ("ESOP"). Zander consulted with 2nd Generation Capital, LLC, a Nashville-based merchant bank, which suggested that Defendants had the expertise to shape and execute the transaction. Zander met with Manchir, who, Plaintiffs say, told Zander that Defendants could advise on the financial, tax, and other benefits that a leveraged ESOP acquisition of a minority interest in JJZIA could bring. Plaintiffs claim that Zander retained both the LLP and KSMBS in February 2011 to advise him on this transaction, and that Manchir executed an engagement letter on behalf of both entities. The LLP denies this, and instead is of the view that Zander never engaged it for any purpose and that Manchir, who is not an employee of the LLP, had no ability to bind it in any manner.

Over the next six months, Defendants—along with a phalanx of consultants, accountants, and lawyers—advised Zander on the proposed acquisition of certain JJZIA assets by the to-be-formed Zander Group Holdings, Inc. ("ZGH") ESOP.[1] Zander settled on a leveraged ESOP acquisition of a minority interest in JJZIA for multiple reasons. In addition to providing the liquidity and additional income, the structure also promised to deliver another critical component that Defendants projected: a $2.4 million "tax savings" over the first five years.

---

[1] Instead of getting into the mechanics of the corporate structure engineered for the transaction here, the Court will describe below those details relevant to the legal analysis.

2

Plaintiffs allege that the anticipated "tax savings" were a subject of frequent and lengthy discussions Zander had with Defendants. In July 2011, for example, Zander emailed Manchir asking about "some tax free income benefits to me" that they previously discussed. "[B]efore I sign," Zander wrote, "I want to make sure all the numbers are what they are supposed to be one last time." In response to that email, Manchir sent a spreadsheet detailing what Manchir described as a $2.4 million in "tax savings" that Zander would realize when the deal was done. Plaintiffs say that Zander proceeded with the leveraged ESOP acquisition in reliance on Manchir's spreadsheet and other representations Defendants made about "tax savings" during the process.

It turns out that the parties had two different understandings of the term "tax savings." Zander thought it meant that he would pay $2.4 million less in federal income tax and operate like a tax credit. But in early 2012, he learned that was not true; at best, the transaction would yield a tax deduction equal to some portion of $2.4 million. So instead of a dollar-for-dollar decrease of tax liability, the purported "savings" would only work to reduce taxable income. To make matters worse, Plaintiffs claim that Defendants wrongly described the specific corporate entity to which this limited benefit would redound.

Plaintiffs filed suit in the Chancery Court for Davidson County in August 2012. Their three-count complaint asserts claims for negligence, negligent misrepresentation, and breach of fiduciary duty stemming from the allegedly bad advice Defendants provided. Among other things, Plaintiffs seek $2,426,591 in compensatory damages, as well as a sum necessary to provide a net tax savings of $2,426,591. Invoking this Court's diversity jurisdiction, Defendants removed the case to federal court in September 2012.

Before the Court are four motions: the LLP's motion for summary judgment; Defendants' motion for partial summary judgment; Plaintiffs' motion for summary judgment; and Plaintiffs' motion to strike. The Court will consider the motions in that order.

## **LEGAL STANDARD**

A party may obtain summary judgment if the evidence establishes that there are no genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Covington v. Knox Cnty. Sch. Sys.*, 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the Court that the standards of Rule 56 have been met. *See Martin v. Kelley*, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question is whether any genuine issue of material fact is in dispute. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Covington*, 205 F.3d at 914 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported summary-judgment motion, the nonmoving party must set forth specific facts that show a genuine issue of material fact for trial. If the party does not do so, summary judgment may be entered. Fed. R. Civ. P. 56(e). The nonmoving party's burden to point to evidence demonstrating a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

## ANALYSIS

**I.     The LLP's motion for summary judgment**

The LLP seeks summary judgment as to all issues because it maintains that Zander did not retain it to perform any services and did not get any advice—negligent or otherwise—from it. The LLP presses three arguments to free itself from Plaintiffs' claims. First, the LLP explains that the engagement letter Zander signed indicates that KSMBS, not the LLP, would provide consulting services. Second, the LLP points out that the engagement letter did not indicate that Zander required any "attest" services, which the LLP says is the only type of work that it does.[2] Finally, the LLP insists that Manchir, who provided the allegedly deficient advice to Zander, is an employee of KSMBS and has no affiliation with the LLP. The record, however, does not reflect the clear line between the LLP and KSMBS that the LLP now wants to draw. Instead, as Plaintiffs argue, the evidence could amply support a jury's conclusion that Manchir acted with apparent authority on behalf of both entities.

Tennessee courts have long recognized that "a principal may be held vicariously liable for the negligent acts of its agent when the acts are within the actual or apparent scope of the agent's authority." *Abshure v. Methodist Healthcare-Memphis Hosps.*, 325 S.W.3d 98, 105 (Tenn. 2010). Tennessee court describe apparent authority as:

> (1) such authority as the principal knowingly permits the agent to assume or which he holds the agent out as possessing;
> (2) such authority as he appears to have by reason of the actual authority which he has;

---

[2] As distinct from the LLP—which relies on certified public accountants (CPAs) to provide "attest" services to its clients, such as audits, reviews, and compilations of a firm's books and records—KSMBS employs CPAs and non-CPAs to meet clients' various business-consulting needs, including tax compliance, bookkeeping, and general accounting services.

(3) such authority as a reasonably prudent man, using diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess.

*SecurAmerica Bus. Credit v. Schledwitz*, 2014 WL 1266121, at *18 (Tenn. Ct. App. Mar. 28, 2014). "The scope and extent of an agent's authority are questions of fact that must be determined from all of the facts and circumstances of the particular case." *Id.* at *16 (citing *Southland Express, Inc. v. Scrap Metal Buyers of Tampa, Inc.*, 895 S.W.2d 335, 340 (Tenn. Ct. App.1994). "[Q]uestions of apparent authority . . . are therefore for the jury to determine." *Jestes v. Saxon Mortg. Servs., Inc.*, 2014 WL 1847806, at *15 (M.D. Tenn. May 8, 2014) (quoting *Gunkel v. Secure One, Inc.*, 2006 WL 3524479, at *3 (E.D. Tenn. Dec. 6, 2006)).

Plenty of evidence exists in the record to present a jury question as to whether Manchir acted as the LLP's agent and that the LLP cloaked him with the authority to do so. For example, the February 15, 2011 engagement letter on which the LLP principally relies. The letterhead says in large, capital letters "KATZ, SAPPER & MILLER." (Docket No. 69-5 at 1). In the corner, it reads in small type: "KSM Business Services, Inc., An Affiliate of Katz, Sapper & Miller, LLP, Certified Public Accountants." (*Id.*). The letterhead gives the same address, telephone, and fax number for both entities. (*Id.*). The LLP argues that this is KSMBS's letterhead and that the LLP uses a distinct letterhead for its communications, (Docket No. 107-2 at 1). But, as Plaintiffs point out, this fact is disputed. (*See, e.g.*, Docket No. 76 at 5–6).

Apart from the letterhead, the content of the engagement letter similarly fails to show that Zander did not retain the LLP, and in fact could be seen as the opposite. "We will provide consulting services," the letter states, without defining "we." (Docket No. 69-5 at 1). Manchir and Scott A. Read signed the letter, but did not identify their affiliation in the document. (*Id.* at 2). More, the letter lays out "the billing rates for the professional[s] that will work on this

engagement." Included in this group are "Partners," whose services fetch $425 an hour. As Plaintiffs are quick to point out, the LLP has partners but KSMBS does not. At a minimum, the parties dispute this point. (*See* Docket Nos. 76 at 3 & 74 at 4).

Other indicia of Manchir's fluid relationship to the LLP exist. His email signature block, for example, expressly indicates his affiliation with Katz, Sapper & Miller LLP. (Docket No. 74-5 at 1–2). And while each Powerpoint presentation Manchir produced for Zander was stamped with the words "All information ©2011, KSM Business Services, Inc.," each was also emblazoned with the logo of "KATZ, SAPPER & MILLER, Certified Public Accountants," undermining the LLP's position that its CPAs were cleaved off from the engagement. (Docket Nos. 74-7 at 3, 74-8 at 3, 74-12 at 1). Finally, the invoices Zander received did little to clarify the LLP's non-involvement. To the contrary, each one contains the following address block:

> INVOICE
> Katz, Sapper & Miller LLP
> KSM Business Services, Inc.
> 317.580.2000

(Docket Nos. 74-1 at 4–6).

At bottom, there is no shortage of evidence that would allow a reasonable jury to conclude that the LLP permitted Manchir to assume the authority to act on its behalf. As a result, the Court will deny the LLP's summary-judgment motion. A jury can decide if the circumstances show that the LLP cloaked Manchir with the authority to act for it.

## II.  Defendants' motion for partial summary judgment

Defendants next move for partial summary judgment "as to all issues arising from an unsigned, undated 'schedule' to a Management Agreement." (Docket No. 97 at 1). The Court finds this motion puzzling, but needs to provide some more factual background to explain why.

To undertake the ESOP transaction, Zander had to engineer a new corporate configuration. First, Zander had to form a new entity to sponsor the ESOP plan because JJZIA, as a partnership, could not do so. So Zander created ZGH, a subchapter S corporation that would own a 49% interest in JJZIA, to be the plan sponsor. Next, Zander was advised that JJZIA's employees should become employees of ZGH to be eligible to participate in the ZGH-sponsored ESOP, and then be "leased" back to JJZIA. ZGH and JJZIA entered into a Management Agreement on September 1, 2011, for that purpose.

Under the Agreement's terms, JJZIA agreed to pay ZGH the "cost of labor" of ZGH's employees. (Docket No. 104-1 at 1–2). The Agreement states that the "cost of labor" includes "the compensation paid to the ZGH Employees (including without limitation, wages reported on IRS Form W-2, plus pre-tax employee elective deferrals), the cost of employee benefits provided to the ZGH Employees and cost of insurance coverage for each period of service performed by the ZGH Employees." (*Id*.). Finally, the Agreement says that the "cost of labor for the ZGH Employees is set forth on the Staffing Schedule, which may be modified from time to time by the Parties, provided that any such modification shall be in writing and signed by the Parties." (*Id*.).

In addition to this employee "lease back" arrangement reflected in the Management Agreement, ZGH and JJZIA also entered into a separate Loan and Pledge Agreement. This latter agreement accomplished two goals. First, ZGH loaned the ESOP $35.5 million to fund the ESOP's indirect purchase of a 49% interest in JJZIA. (Docket No. 104-2 at 1). Next, to ensure that the ESOP could service that debt, ZGH agreed to "make contributions to the ESOP in amounts which . . . are sufficient to enable the [ESOP] to make all principal and interest payments" to ZGH. (*Id*. at 4–5).

8

As Plaintiffs explain, the Staffing Schedule attached to the Management Agreement as Exhibit A consisted of several dozen employee names, but, due to an "oversight," did not include figures indicating the costs of those employees' labor. (Docket No. 101 at 6). Consistent with the Agreement's provision that JJZIA and ZGH could modify the "cost of labor for the ZGH Employees . . . set forth on the Staffing Schedule," Plaintiffs maintain that the contracting parties have done so each month in writing to reflect changes in those costs (*e.g.*, new employees, increased salaries, etc.). (*Id*. at 7 n.2).

A brief description of what Defendants dub the "unsigned, undated 'schedule' to a Management Agreement," and which lies at the heart of their motion, rounds out the context necessary for the Court's analysis. Plaintiffs identify this document as a modification to the Management Agreement's Staffing Schedule that shows the costs of the ZGH employees' labor for October 2013.[3] The document aggregates labor-related expenditures into four categories. (Docket No. 97-7 at 1). Under the "Salaries" category, it lists "Payroll Taxes expense," "Pension Expense," "Insurance Expense," "Employee Benefits," and "HSA Expense" (presumably deciphered as Health Savings Account). (*Id*.). The next category, "Insurance Invoices," includes line items for "UNUM," "BCBS," "Standard," "UNUM" (again), and "H.S.A. – Jeff." (*Id*.). The third category, "Deductions," breaks down entries for "Medical," "LTD," "Life," and "H.S.A." (*Id*.). The final category, "Insurance Expense," stands alone and appears to calculate a figure that subtracts the total for "Deductions" from the "Insurance Invoices" category. (*Id*.).

Defendants fear that Plaintiffs will rely on the October 2013 Staffing Schedule to modify the Management Agreement, which Defendants read to require JJZIA to reimburse ZGH for all ESOP-related expenses because those expenses are "employee benefits" that are included in the

---

[3] Although the parties dispute the characterization of this document, for ease the Court will refer to it as the "October 2013 Staffing Schedule."

9

"cost of labor." (*Id*. at 2–5). Defendants' view is that the Management Agreement includes such a reimbursement requirement. And they portend that Plaintiffs will draw on the October 2013 Staffing Schedule—which shows that ZGH charged JJZIA $0 for employee benefits that month—to establish that the Management Agreement, as drafted in 2011 before the deal was done, does not require JJZIA to make ESOP-related expense reimbursements to ZGH.

So how does the meaning of "employee benefits" or "cost of labor," as these terms are used in Management Agreement (and as allegedly modified by the October 2013 Staffing Schedule), relate to Plaintiffs' claims that Defendants are liable for wrongly representing to Zander that he would pay $2.4 million less in federal income tax? The Court is stumped. The nub of the parties' dispute is what Manchir and his confederates meant when they told Zander that he would realize "tax savings"—a tax credit that would result in a dollar-for-dollar reduction in tax liabilities, as Plaintiffs insist, or a tax deduction that would reduce Plaintiffs' income subject to tax, as Defendants say. Even if the Court were to agree with Defendants that the Management Agreement includes all ESOP-related contributions in "employee benefits" or "cost of labor," that would only change the amount of the deduction to which JJZIA might be entitled (since a higher amount of qualifying business expenses attributable to ESOP-related costs would increase JJZIA's deductions); it would have no bearing on whether Zander rightly understood that he would get a tax credit and not a tax deduction as a consequence of the transaction.

And even if the October 2013 Staffing Schedule could conceivably be read to amend the definition of "employee benefits" or "cost of labor" to somehow exclude ESOP expenses that were allegedly reimbursable under the Management Agreement, Defendants have little to fear for another reason: Plaintiffs have expressly walked away from this position. In their response brief, Plaintiffs write that they "have never claimed, and do not now claim, that the Management

Agreement has been modified or amended." (Docket No. 101 at 3). The Court has no reason to believe that Plaintiffs will not conduct themselves consistently with this position at trial.

Defendants' motion also misses the mark because it tries to engraft a meaning on terms in the contract that the parties to the agreement reject. The principles of contract interpretation in Tennessee are well-known:

> The "cardinal rule" of contract construction is to ascertain the intent of the parties and to effectuate that intent consistent with applicable legal principles. *Frizzell Constr. Co. v. Gatlinburg, L.L.C.*, 9 S.W.3d 79, 85 (Tenn. 1999). [A court's] first task when construing a contract is to determine whether its language is ambiguous. *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 889–90 (Tenn. 2002). It is well-settled that "the interpretation of an unambiguous written contract generally is an issue of law." *Childress v. Union Realty Co.*, 97 S.W.3d 573, 577 (Tenn. Ct. App. 2002) (citing *Hibernia Bank and Trust Co. v. Boyd*, 48 S.W.2d 1084, 1086 (1932)).
>
> A contractual term may be determined to be ambiguous, however, if it is "susceptible to more than one reasonable interpretation." *Planters Gin*, 78 S.W.3d at 890 (citation omitted). Ambiguity does not arise "'merely because the parties may differ as to interpretations of certain of its provision.'" *Johnson v. Johnson*, 37 S.W.3d 892, 896 (Tenn. 2001) (quoting *Cookeville Gynecology & Obstetrics, P.C. v. Southeastern Data Sys., Inc.*, 884 S.W.2d 458, 462 (Tenn. Ct. App. 1994)). Rather, "a contract is ambiguous only when it is of uncertain meaning and may fairly be understood in more ways than one.'" *Planters Gin*, 78 S.W.3d at 890 (quoting *Empress Health & Beauty Spa, Inc. v. Turner*, 503 S.W.2d 188, 190–91 (Tenn. 1973)).
>
> Upon determining that a contract is ambiguous, the court must apply established rules of construction to determine the intent of the parties. *Id*. Tennessee courts adhere to the general rule that ambiguities in a contract are construed against the drafter. *Ralph v. Pipkin*, 183 S.W.3d 362, 367 (Tenn. Ct. App. 2005) (citation omitted). It is well-settled that parol evidence regarding "the relations existing between the parties, the facts surrounding them at the time when they entered into the agreement, and also their acts subsequent thereto" may be considered by the court when interpreting an ambiguous contractual provision. *Faulkner v. Ramsey*, 158 S.W.2d 710, 711 (Tenn. 1942); *see also Stonebridge Life Ins. Co. v. Horne*, No. W2012-00515-COA-R3-CV, 2012 WL 5870386, at *8 (Tenn. Ct. App. Nov. 21, 2012) (quoting 45 C.J.S. Insurance § 573 (footnotes omitted))).
>
> When a contract is determined to be ambiguous after application of the rules of construction, then the interpretation of the contract becomes a question of fact for the finder of fact. *Planters Gin*, 78 S.W.3d at 890.

*Dog House Invs., LLC v. Teal Props., Inc.*, 2014 WL 539530, at *3–4 (Tenn. Ct. App. Feb. 7, 2014) (alterations in original omitted).

Defendants ask the Court to establish as a matter of law that the Management Agreement's use of the term "employee benefits" and "cost of labor" necessarily includes any ESOP-related expenses ZGH might incur. If Defendants' position is that the plain language of the Management Agreement unambiguously supports this construction, the Court disagrees, since the Management Agreement does not so much as mention ESOP-related expenses, making its meaning anything but crystal clear. The better argument is that the meanings of "employee benefits" and "cost of labor" are ambiguous given the failure of the Management Agreement to define these terms. Reading the agreement alone, the Court agrees that the parties could have intended ESOP-related expenses to come within the terms "employee benefits" and "cost of labor."

Given that ambiguity, the Court next considers "parol evidence regarding the relations existing between the parties [and] the facts surrounding them at the time when they entered into the agreement," *id*. at *4, mindful that the *litigating* parties seeking to interpret the Management Agreement are not the same as the *contracting* parties who entered into it. On one side, Defendants cite Manchir's deposition testimony, in which he stated that "long before the closing, [Defendants] were asked to review a management services agreement that showed . . . the way these employees would be leased" and made it, "to us, very clear that the ESOP benefit was another benefit expense which would be charged" to JJZIA by ZGH. (Docket No. 75 at 24). Manchir, in other words, believed that JJZIA "would be charged with its share of [ESOP compensation] expenses as part of the Management Services Agreement." (*Id*. at 9). Manchir's

deposition testimony appears to be the sum total of the evidence Defendants marshal to fortify their position. This is scant support for the conclusion that the parties to the Management Agreement intended Defendants' interpretation of the meaning of "employee benefits" and "cost of labor" to obtain.

On the other side of the divide, Plaintiffs offer a divergent view. Recall that Zander executed the Management Agreement on behalf of both JJZIA and ZGH. (Docket No. 104 at 1). As to the parties' intent on entering into the Management Agreement, Plaintiffs maintain:

> JJZIA and ZGH both understood and agreed that the "cost of labor" JJZIA was to pay to ZGH to "lease" the employees consisted of the salary (including applicable payroll and unemployment taxes) and benefits JJZIA paid to (or on behalf of) its employees immediately prior to execution of the Management Agreement. The benefits included in the "cost of labor" consisted of health and disability insurance and any matching contributions paid pursuant to the Company's 401k plan. Prior to execution of the Management Agreement, there was never any discussion (much less agreement) that JJZIA would reimburse to ZGH under the Management Agreement any contributions ZGH might make to the newly formed ESOP.

(*Id*. at 2 (paragraph breaks omitted)). Plaintiffs continue that the parties conducted themselves consistently with this understanding after entering into the agreement:

> From September 1, 2011 to the present, JJZIA has paid the "cost of labor," as defined above, to ZGH in accordance with the terms of the Management Agreement . . . . As of September 1, 2011, ZGH had made no contribution to the ESOP, nor did it make any such contribution until one year later, on August 31, 2012, when it made a contribution of $314,752. JJZIA has never paid any amounts to ZGH to reimburse ZGH for any contributions made to the ESOP.

(*Id*. at 2–3). Finally, Plaintiffs say that "neither ZGH nor JJZIA ever intended or agreed that JJZIA would reimburse ZGH for any contributions ZGH may make to the ESOP." (*Id*. at 3). Nor, they conclude, has there ever been "any disagreement or confusion between ZGH and JJZIA as to what 'cost of labor' JJZIA is to pay to ZGH under the Management Agreement . . . .

13

Such cost has never included any contributions ZGH might make to the ESOP. ZGH and JJZIA have never modified the Staffing Schedule to include amounts with [sic] ZGH has contributed to the ESOP." (*Id.*). Defendants offer little in the way of rebuttal.

Amidst such disagreement over the meaning of these terms, and the presence of competent evidence from which a jury could well side with Plaintiffs' view of the Management Agreement, Defendants have not met their burden to establish the lack of a genuine dispute of material fact that might entitle them to summary judgment. Having considered all of the grounds on which Defendants seek summary judgment, the Court will deny their motion.

### III. Plaintiffs' motion for summary judgment

Plaintiffs' seek judgment on their claims against Defendants for negligent misrepresentation (Count 2) and negligence (Count 1). They also seek dismissal of Defendants' comparative-fault affirmative defense.

*A. Negligent misrepresentation*

In Tennessee, a plaintiff asserting a negligent-misrepresentation claim must prove:

> (1) that the defendant was acting in the course of its business, profession, or employment, (2) that the defendant supplied false information for the guidance of others in its business transactions, (3) that the defendant failed to exercise reasonable care in obtaining or communicating the information, and (4) that the plaintiff justifiably relied on the information.

*Sears v. Gregory*, 146 S.W.3d 610, 621 (Tenn. Ct. App. 2004).

The parties tussle over several elements. As to the second, Plaintiffs assert that Manchir's representation that Zander would realize some $2.4 million in "tax savings" was just flat wrong: instead of getting a tax credit in that amount, the best Zander could really do was to get a $2.4 million tax deduction, and that only if JJZIA first paid ZGH $4.7 million. (Docket No.

14

72 at 6–7). Defendants counter that the information Manchir provided accurately described the benefits Zander would receive; the term "tax savings," they say, while imprecise, could just as readily mean "tax credit" as it can "tax deduction." Defendants draw on the deposition of Plaintiffs' expert, James Berry, whose testimony supports Defendants' position:

> Q: All right, sir. We have seen use of some terms tax savings. In your mind, or in your field, do tax savings equal a tax credit?
>
> A: No. Well, I mean, tax savings would generally—a tax credit would be a tax savings. A tax deduction is not a tax savings. A tax deduction would result in a tax savings, but a credit—that's what a credit is, is a direct reduction of taxes.
>
> Q: But if you're talking about tax savings, that does not necessarily equal a tax credit; is that correct?
>
> A: No. A tax savings may be the result of a tax deduction.
>
> Q: All right. So tax—let me put it another way. Tax savings is broader than a tax credit; would that be correct?
>
> A: Yes.

(Docket No. 97-6 at 26–27). At a minimum, this evidence demonstrates that the meaning of Defendants' representation of $2.4 million in "tax savings" is disputed.

Also disputed is the third element, whether Zander reasonably relied on Defendants' alleged misrepresentation. Plaintiffs point to an email Zander sent to Manchir stating that he wanted to see Manchir's calculations "before signing on the dotted line" so that Zander could "could make sure all the numbers are what they are supposed to be one last time." (Docket No. 72 at 8). Defendants respond that Zander's reliance solely on the spreadsheet that Manchir sent him in response to this email (which contained the "tax savings" language) was unreasonable. They point out that in a transaction in which dozens of advisors generated thousands of pages of documents and communications over several months, it is for a jury to decide whether Zander reasonably relied on "one phrase on one line of one page" of that mountain. (Docket No. 108 at 10). The Court agrees. "Whether a plaintiff's reliance on alleged misstatements is reasonable is

15

. . . generally a question of fact inappropriate for summary judgment." *City State Bank v. Dean Witter Reynolds, Inc.*, 948 S.W.2d 729, 737 (Tenn. Ct. App. 1996); *see also Davis v. McGuigan*, 325 S.W.3d 149, 158 (Tenn. 2010) (stating that with respect to an intentional-misrepresentation claim, "[w]hether a person's reliance on a representation is reasonable generally is a question of fact"). So it is here. Factual disputes preclude summary judgment on Plaintiffs' negligent-misrepresentation claim.

Plaintiffs also seek summary judgment on the measure of damages that applies to their negligent-misrepresentation claim. They maintain they are entitled to damages that give them the benefit of his bargain; namely, the difference between the actual value of the property received and the value the property they would have possessed had the representations been true. While Tennessee courts may apply the benefit-of-the-bargain rule to actions for negligent misrepresentation, *see, e.g.*, *Rose v. City of Covington*, 634 S.W.2d 268, 269 (Tenn. 1982), they are "not required" to do so "mechanically in every misrepresentation case," *Muesing v. Ferdowsi*, 1991 WL 20403, at *7 (Tenn. Ct. App. Feb. 21, 1991). The Court declines to resolve as a matter of law a measure of damages that may or may not be appropriate in this case.

### B. Negligence

Plaintiffs premise their request for summary judgment on their negligence claim on a single, flawed argument. Plaintiffs start out on the right road, suggesting that the principal question is whether the consulting services and tax advice Defendants provided complied with the applicable standard of care, since in negligence actions such as this one, "[p]rofessionals are judged according to the standard of care required by their profession." *Dooley v. Everett*, 805 S.W.2d 380, 384–85 (Tenn. Ct. App. 1990); *see also Delmar Vineyard v. Timmons*, 486 S.W.2d 914, 920 (Tenn. Ct. App. 1972) ("The standard of care applicable to the conduct of audits by

public accountants is the same as that applied to doctors, lawyers, architects, engineers and others furnishing skilled services for compensation and that standard requires reasonable care and competence therein."). But Plaintiffs veer off course when they insist that the yardstick to measure Defendants' conduct is the standard of care applicable to licensed CPAs in Tennessee. (Docket No. 71 at 2). Plaintiffs reason that they are entitled to summary judgment because Tennessee courts generally require expert testimony "to acquaint the finder of fact with the applicable professional standard in each case," *Cleckner v. Dale*, 719 S.W.2d 535, 540 n.4 (Tenn. Ct. App. 1986), *abrogated on other grounds by Chapman v. Bearfield*, 207 S.W.3d 736 (Tenn. 2006); *see also Lazy Seven Coal Sales, Inc. v. Stone & Hinds, P.C.*, 813 S.W.2d 400, 406 (Tenn. 1991), and, here, Defendants failed to get a qualified expert to testify as to the standard of care applicable to Tennessee CPAs.

Plaintiffs are mistaken for three reasons. First, in demanding summary judgment because Defendants have not submitted a dueling expert to rebut the conclusions Plaintiffs' expert drew, Plaintiffs erroneously put on Defendants a burden that is theirs alone. As the side asserting that Manchir and his cohorts were negligent, Tennessee requires Plaintiffs to establish the applicable standard of care and to show that Defendants did not meet it. Tennessee does not impose a reciprocal obligation on Defendants. While many defendants in professional negligence actions find it salutary to produce their own expert evidence to rebut the charges against them, doing so is not "necessary to a successful defense of this" or any other professional-negligence action, as Plaintiffs would have it. (Docket No. 71 at 3). Successful cross-examination and impeachment that would lead a jury to conclude that an expert is not credible would be enough for Defendants to prevail on this claim. "Whether a [professional's] conduct meets a particular standard of

conduct," after all, "is not a question of law for the court" but rather "a question of fact for the jury or other finder of fact to decide." *Cleckner*, 719 S.W.2d at 540.

Second, Plaintiffs ignore that the parties fight over which profession should supply the applicable standard of care. Plaintiffs are right that Defendants have not put forward expert evidence as to the standard of care that applies to CPAs in Tennessee. But that may not matter. It may be irrelevant if, for example, the evidence shows that Manchir's allegedly negligent advice was not given in his capacity as a CPA (which Manchir notably is not), but rather as an ESOP consultant. In that case, a jury could rely on Defendants' opinion testimony as to the standard of care applicable to that professional group. The Court will not resolve this issue as a matter of law before the evidence develops at trial as to the precise services Defendants provided and the professional standard of care applicable to those services.

Third, even assuming that Plaintiffs have established that Defendants' conduct must be measured against the standard of care that applies to Tennessee CPAs, granting summary judgment on Plaintiffs' negligence claim would require the Court to accept as a matter of law that the conclusions Plaintiffs' expert arrived at as to Defendants' deviation from that standard are correct. The Court will not do that before this expert has been subjected to adversarial questioning. At that time, a jury will determine the weight to accord to the expert's conclusions.

The Court will deny Plaintiffs' motion for summary judgment on the negligence claim.[4]

---

[4] Relying on many of the same arguments, Plaintiffs separately move to strike Defendants' proposed expert testimony regarding the standard of care applicable to Tennessee CPAs, bar Defendants from introducing expert testimony on the standard of care applicable to Tennessee CPAs under Federal Rule of Evidence 703, and deny Defendants' anticipated attempt to supplement their expert disclosures as to the standard of care to which Tennessee CPAs are held. (Docket No. 88; Docket No. 89 at 4–10). Plaintiffs' motion is curious, since the parties agree that Defendants' experts have not opined on the standard of care applicable to CPAs in Tennessee. (*Id*. at 2–3; Docket No. 96 at 10–15). As a result, the Court will deny

*C. Comparative fault*

Finally, Plaintiffs seek dismissal of Defendants' affirmative defense of comparative fault. In their operative answer to Plaintiffs' complaint, Defendants allege that more than a dozen non-parties involved in the ESOP transaction bear some responsibility for Zander's alleged losses. Plaintiffs principally complain that Defendants produced scant evidence to support their comparative-fault allegations during discovery, providing "evasive" answers to Plaintiffs' interrogatories on the issue and failing to offer competent testimony from their Rule 30(b)(6) designees to back up the claims. In opposition, Defendants marshal details of the other advisors' roles in the deal, arguing that a reasonable jury could conclude that those non-parties contributed to Zander's understanding of the "tax savings" he would receive.

The circumstances here make summary judgment inappropriate. First, this is not a case in which Defendants were hiding the ball about the roles the accused non-parties played. Having organized the transaction team, Zander is intimately acquainted with each of them and the work they did on the deal. Plaintiffs may disagree about their culpability, but they cannot claim that Defendants' discovery responses left them in the dark as to Defendants' allegations. Moreover, the parties deposed several non-parties at whom Defendants now point the finger. This fact further weakens Plaintiffs' argument that they do not know how Defendants will support their comparative-fault claims. Finally, "comparative fault is a question of fact within the jury's province, which should not lightly be invaded by the trial court." *LaRue v. 1817 Lake Inc.*, 966 S.W.2d 423, 427 (Tenn. Ct. App. 1997). Given the circumstances of this case, the Court concludes that the most prudent course is to submit the question of the degree of fault of the named non-parties to a jury.

---

Plaintiffs' motion to strike parts of expert disclosures that do not exist, bar testimony that Defendants say they do not plan to introduce, and turn away a request to supplement disclosures that has not been made.

## CONCLUSION

For the reasons stated, the Court will DENY Defendant Katz, Sapper & Miller, LLP's motion for summary judgment (Docket No. 69); DENY Defendants' motion for partial summary judgment (Docket No. 97); DENY Plaintiffs' motion for summary judgment (Docket No. 71); and DENY Plaintiffs' motion to strike (Docket No. 88).

An appropriate Order will be entered.

_Kevin H. Sharp_
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE